1

2

3

4

5

6

7

8

9

10

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

11 **JEANNE PEREZ DENISON,**                )
                                           )        3:10-cv-00903-HU
12                     Plaintiff,           )
                                           )
13       vs.                               )        **FINDINGS AND**
                                           )        **RECOMMENDATION**
14 **KAISER FOUNDATION HEALTH PLAN**       )
   **OF THE NORTHWEST,** an Oregon         )
15 corporation, and **DAVID G. FISHER,**   )
                                           )
16                     Defendants.         )
                      _____

17

Daniel Snyder
18 Carl Post
   Erin McCool
19 LAW OFFICES OF DANIEL SNYDER
   1000 SW Broadway, Suite 2400
20 Portland, Oregon 97205

21       Attorneys for Plaintiff

22 Chris Kitchel
   Amy Joseph
23 Ryan S. Gibson
   STOEL RIVES LLP
24 900 SW Fifth Avenue, Suite 2600
   Portland, Oregon 97204

25
         Attorneys for Defendant
26       Kaiser Foundation Health Plan of the Northwest

27 Maryann Yelnosky
   Emily Q. Shults
28 BULLARD SMITH JERNSTEDT WILSON

FINDINGS AND RECOMMENDATION

1000 SW Broadway, Suite 1900
Portland, Oregon 97205

Attorneys for Defendant David G. Fisher

HUBEL, Magistrate Judge:

### Findings and Recommendation

Presently before the court are defendants Kaiser Foundation Health Plan of the Northwest ("Kaiser") and David Fisher's ("Fisher") (collectively, "Defendants") motions for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(c). Kaiser moves the court for an order granting it summary judgment on all of plaintiff Jeanne Perez Denison's ("Denison") claims, as well as summary judgment on Kaiser's two counterclaims asserted in its Amended Answer filed on April 12, 2011. Fisher moves for summary judgment against Denison's tort claim of invasion of privacy. For the reasons set forth below, Kaiser's motion (Docket No. 47) for summary judgment should be GRANTED in part and DENIED in part, and Fisher's motion (Docket No. 48) for summary judgment should be GRANTED in part and DENIED in part.

### Background

**I.    Relevant Kaiser Employment Policies**

Denison worked as a Registration Representative, also called a "Reg Rep" or member intake specialist ("MIS"), at Kaiser's Urgent Care center on North Interstate Avenue in Portland, Oregon. (Peterson Decl. ¶ 2; Denison Dep. 35:20-38:2.) Denison's job was to check in Kaiser members for Urgent Care appointments. (Peterson Decl. ¶ 6; Denison Dep. 38:11-21.) After July 2007, Fisher was the Urgent Care Business Operations Supervisor ("BOS") and Denison's direct supervisor. (Peterson Decl. ¶ 3.) Fisher's supervisor was

FINDINGS AND RECOMMENDATION    2

1  Business Services Manager ("BSM") Brad Peterson ("Peterson") after
2  February 2008.  (Peterson Decl. ¶¶ 2-3.)

3      **A.  Cash-Handling**

4      As a MIS, Denison was required to handle cash from patient co-
5  pays according to Kaiser's cash-handling policies.  (Peterson Decl.
6  ¶ 4.)    On October 17, 2007, Denison signed a Cash Handling
7  Agreement affirming that she would do so and admitted she
8  considered cash handling essential to the performance of her
9  duties.  (Gibson Decl. Ex. A at 77; Denison Dep. 39:19-23, 68:2-
10 69:16.)  Each MIS must comply with several specific aspects of the
11 cash-handling policies, such as the requirement that each MIS
12 maintain a start-up fund of $150 in cash.  (Peterson Decl. ¶ 6.)
13 During a shift the start-up fund must be kept secured in a locked
14 drawer at the MSI's workstation.  (Peterson Decl. ¶ 6.) After a
15 shift, cash is kept in a secure cash room accessible only by typing
16 a passcode into a lock keypad.  (Peterson Dep. 28:17-29:19; Fisher
17 Dep. 85:14-88:13; Peterson Decl. ¶ 6.)   Employees open the till
18 locker with a key that must be kept on their person at all times.
19 (Fisher Dep. 88:19-91:20; Peterson Decl. ¶ 6.)

20     At the end of a shift, the MIS must properly document all cash
21 received, return the $150 start-up fund to the till locker, and
22 deposit any cash and checks received from patients during that
23 shift into a safe in the cash room.  (Peterson Decl. ¶ 7; Fisher
24 Dep. 183:14-187:20.)  An employee depositing cash must do so with
25 another coworker present as a witness, and the coworker must sign
26 the deposit documentation.  (Peterson Decl. ¶ 7.)   The safe is
27 considered "dual custody," *e.g.*, Peterson and Fisher had one-half
28 of the combination and the armored car company had the other half,

FINDINGS AND RECOMMENDATION       3

1   so the safe could only be opened when both combinations were
2   entered together. (Peterson Decl. ¶ 7.)  To deposit cash, the MIS
3   drops a cash bag containing the cash along with documentation into
4   a weighted, cylindrical tumbler on top of the safe, and turns a
5   handle to roll the tumbler until the bag drops into the safe.
6   (Peterson Decl. ¶ 7; Fisher Dep. 85:14-88:13.)  In November 2008,
7   Fisher became aware that it was possible to place a deposit in the
8   tumbler, turn it, and not have the deposit drop into the safe.
9   (Gibson Decl. Ex. A at 190.)  As a result, Fisher instructed all
10  employees to "make sure you check the bottom of the tumbler after
11  its turned to insure your bags have been dropped." (Gibson Decl.
12  Ex. A at 190; Denison Dep. 227:18-228:4.)

13      **B.   Corrective Action**

14      Kaiser employs a progressive discipline system that includes
15  five levels of "Corrective Action." (Peterson Decl. ¶ 8.)  Under
16  this system, employees are usually verbally counseled or coached
17  for non-serious first-time workplace policy infractions. (Peterson
18  Decl. ¶ 8.)  Additional violations, or for more severe first-time
19  violations, results in employees being issued a Corrective Action,
20  usually Level 1 or Level 2. (Peterson Decl. ¶ 8.)  Levels 3 and 4
21  are generally reserved for employees that commit additional
22  violations of a similar nature. (Peterson Decl. ¶ 8.)  Kaiser
23  considers Levels 1 and 2 to be coaching and counseling, while
24  Levels 3 and 4 are disciplinary. (Peterson Decl. ¶ 8.)  However,
25  "[a] Level 4 Corrective Action is [] usually a 'last chance'
26  agreement, also known as a 'Day of Decision.'" (Peterson Decl. ¶
27  8.)  When an employee is issued a Level 4 Correction Action, a
28  meeting is held where the employee must choose to voluntarily

FINDINGS AND RECOMMENDATION      4

1  resign or, alternatively, develop an action plan to detail how they

2  will improve their performance.  (Peterson Decl. ¶ 8.)  "If an

3  employee commits another policy violation while on Level 4

4  Corrective Action, the employee can be subject to termination."

5  (Peterson Decl. ¶ 8.)  Prior to issuing any Corrective Action, it

6  is Kaiser's practice that the supervisor hold a discovery meeting

7  with the employee to discuss the facts related to an alleged

8  violation of workplace policy.  (Peterson Decl. ¶ 9.)  Because of

9  the number of people involved in discovery meetings, it can often

10 times take days or weeks to schedule an appropriate date. (Peterson

11 Decl. ¶ 9.)

12 **II.  Denison's Relevant Employment History**

13     On July 18, 2007, Denison received a performance evaluation,

14 wherein her previous supervisor, Karen Wood ("Wood"), indicated

15 Denison "occasionally has difficulties with communication,

16 particularly with her co-workers."  (Denison Dep. 61:20-64:25;

17 Gibson Decl. Ex. A at 73.)  On October 19, 2007, Denison also

18 received a performance evaluation from Fisher that indicated she

19 had communication and teamwork issues.  (Gibson Decl. Ex. A at

20 133.)  Based on a November 2007 incident, Denison was issue a Level

21 1 Corrective Action because a supervisor, Brenda Leonard

22 ("Leonard"), filed a complaint against Denison which indicated:

23         Leonard came in with a patient and stated that [Denison]
           did not verify patient ID, verify patient address, ask
24         about TPL billing, ask about WC billing, and did not ask
           about COB benefits. [Leonard] also said that [Denison]
25         was not pleasant to them, that the waiting room was messy
           (i.e. spilled coffee and food wrappers on the table) and
26         that no copay was collected.

27 (Gibson Decl. Ex. A at 134; Denison Dep. 85:9-89:18.)

28     On February 25, 2008, Fisher sent Denison an email indicating

FINDINGS AND RECOMMENDATION      5

1  that her cash drawer balancing was off "too often." (Gibson Decl.

2  Ex. A at 138;  Denison Dep. 91:7-92:25.)  Denison later received

3  training entitled "Collecting Balances Due." (Gibson Decl. Ex. A

4  at 139; Denison Dep. 92:17-93:19.)

5      On March 23, 2008, Denison contacted Kaiser's Compliance

6  Hotline to report that "Fisher require[d] her to work a 12-hour

7  shift without any breaks (lunches or breaks)." (Denison Decl. Ex.

8  Z at 2.)  Kaiser conducted an investigation and determined:

> Denison worked Saturday night March 22, 2008 to Sunday
> Morning March 23, 2008 without any breaks or lunches. In
> this particular instance there was no one to cover all
> the shifts originally scheduled due to [people calling in
> sick].  The scheduler Trina Polk could not fill the
> entire 6 pm to 3:00 am shift, but did get someone to
> cover 6:00pm to 11:00pm. Jeanne's shift is 7:00pm to
> 7:30am so she worked by herself 11:00pm to 7:00am.
> Coverage for Jeanne's breaks were available the first
> part of her shift, but not for her entire shift. Jeanne
> mentioned that this wasn't just one instance, but has
> previously been the only person working during her 12
> hour shift. . . . Jeanne did mention that sometimes
> either a supervisor (David) or the staff specialist
> (Trina) will get someone to come in and stay just long
> enough to cover breaks.
>
> Denison wants to hire more on-call employees to fill
> these vacant shifts. Denison also has concerns about the
> future of hours and work schedules within the department
> because a change is coming in August 2008. David has not
> required Jeanne to work without a break.

(Denison Decl. Ex. Z at 2.)  Prior to the completion of Kaiser's

investigation, on April 29, 2008, "Fisher sent out a reminder

notice to his nursing supervisors as well as the staffing

specialist and other managers under his scope of responsibility,

indicating that they need to make certain their employees take

lunches and breaks." (Denison Decl. Ex. Z at 3.)

     On or about May 26, 2008, two coworkers discovered an envelope

of cash that Denison taped to the back of her till locker. (Gibson

1 Decl. Ex. A at 142; Fisher Dep. 117:14-121:25; Denison Dep. 100:3-
2 25.)   On June 11, 2008, Denison received a Level 1 Corrective
3 Action for failing to report and account for all funds in violation
4 of Kaiser's cash-handling policies. (Gibson Decl. Ex. A at 140-41;
5 Denison Dep. 96:13-98:20.)

6      On June 23, 2008, Denison made her first request for FMLA
7 leave. (Denison Dep. 113:16-116:11; Gibson Decl. Ex. A at 144-56;
8 Denison Decl. ¶ 31.)

9      On July 7, 2008, coworkers discovered Denison's start-up fund
10 envelope in an unlocked drawer at her reception desk in violation
11 of Kaiser's cash-handling policies.  (Gibson Decl. Ex A at 142;
12 Denison Dep. 120:1-121:19.)

13      On July 12, 2008, Kaiser informed Denison she was "eligible
14 for Family Leave as of 6/23/08," thereby entitling her to 432 leave
15 hours in the following twelve months. (Gibson Decl. Ex. A at 155-
16 56.)

17      Denison was placed on Level 2 Corrective Action by Fisher on
18 July 30, 2008, after a discovery meeting was held regarding the
19 start-up fund envelope being left in an unlocked drawer on July 7,
20 2008.  (Gibson Decl. Ex A at 157; Denison Dep. 119:4-121:19.)

21      Denison committed additional violations of Kaiser's policies
22 in the fall of 2008.  For example, on September 5, 2008, Fisher
23 found unreported cash in Denison's till locker once again, and had
24 Kaiser employee Sacha Woodward ("Woodward") attest to his findings.
25 (Denison's Dep. 175:1-176:8; Gibson Decl. Ex. A at 167; Gibson
26 Decl. Ex. B at 69.)  In late October 2008, Peterson learned that
27 Denison had placed the wrong patient wrist band on two separate
28 patients she had checked into the Urgent Care. (Peterson Decl. ¶

FINDINGS AND RECOMMENDATION      7

15; Gibson Decl. Ex. A at 168; Gibson Decl. Ex. C at 36; Peterson Dep. 101:6-105:16; 106:8-107:17.) Peterson's source was "a nursing supervisor who reported to Mr. Fisher that on two separate days a patient had been checked in and given the wrong identification wristband". (Peterson Supp. Decl. ¶ 5.)  As part of the discovery into the incident, Peterson spoke personally with Sherry Socotch ("Socotch") from Kaiser's Medical/Legal Department. (Peterson Supp. Decl. ¶ 5.)  Socotch informed Peterson that, "she had an incident report that had been filled out after the incident and sent to her office, but that because it contained confidential information, she could not let [him] see the document." (Peterson Supp. Decl. ¶ 5.) Instead, Socotch told Peterson over the phone "*that the incident report indicated that the error could have caused the death of the affected patients*." (Peterson Supp. Decl. ¶ 5) (emphasis added).

On October 27, 2008, Fisher gave Denison a negative performance review, indicating that she continued to fail to meet expectations in areas, such as attendance, cash handling, communication with coworkers, critical thinking, interdepartmental relations, and teamwork. (Gibson Decl. Ex. B at 70-77; Denison Dep. 192:2-200:7; Fisher Dep. 260:17-265:8.)

On or about November 13, 2008, Denison left her key in her unlocked till locker in violation of Kaiser cash-handling policies. (Peterson Dep. 29:22-33:19; Denison Dep. 225:17-227:17; 229:3-25.) Denison's coworker, Megan Thurber ("Thurber"), had discovered the

FINDINGS AND RECOMMENDATION      8

key and reported it to Fisher.[1] (Peterson Decl. ¶ 16; Denison Dep. 221:8-225:10.)

On or about November 20, 2008, Denison submitted a second FMLA request, which Kaiser approved on November 26, 2008. (Denison Dep. 234:19-235:4; Denison Decl. Ex. L.) Denison's November 20 request was merely a recertification of her earlier request on June 23, 2008. (Denison Decl. Ex. L.) Apparently no hours or days of leave were taken at that time.

A discovery meeting was held on December 2, 2008, addressing the wristband and till locker incidents. (Peterson Decl. ¶ 18, Ex. C-D.) Denison was issued a Level 3 Corrective Action for the till locker incidents.[2] (Peterson Decl. ¶ 18, Ex. C.) During the same discovery meeting, Denison received a Level 4 Corrective Action due to the wristband mixups, which Peterson "considered to be a very flagrant violation because she did it twice on two consecutive days, and while already on corrective action for cash-handling violations." (Peterson Decl. ¶ 18, Ex. D.) It is unclear if Peterson's reference to "while already on corrective action" was to the Corrective Actions on June 11, 2008, July 30, 2008, and/or to the first one received as a Level 3 on December 2, 2008. Although Denison received two Corrective Actions on the same day, Peterson

---

[1] On February 5, 2009, Denison received a Level 1 Corrective Action for her behavior toward Thurber following the November 13, 2008 incident. (Denison Dep. 255:17-256:22; Gibson Decl. Ex. A at 221.)

[2] It appears this was for two incidents, failing to report a cash transaction on September 5, 2008, and the till locker key issue of November 13, 2008. (Gibson Decl. Ex. A at 201; Peterson Decl. Ex. C.)

FINDINGS AND RECOMMENDATION        9

1 states:

> I was aware that Mr. Fisher tried for several weeks in
> late October and November 2008 to schedule discovery
> meetings with Ms. Denison to investigate the wristband
> and till locker key incidents. Both Ms. Denison and her
> union representatives either refused to meet or appeared
> to have frequent scheduling conflicts. Coordinating the
> discovery meetings was additionally difficult because Ms.
> Denison worked a 3-day workweek, and only one of her days
> was during the week when her union representatives were
> available.    Despite the logistical issues, by late
> November 2008 it became obvious that Ms. Denison and her
> union were simply 'stalling' holding the discovery
> meetings, because they knew she would be receiving
> additional corrective action resulting from the wristband
> and till locker key incidents.

(Peterson Decl. ¶ 17.)

Because Denison was issued a Level 4 Corrective Action, pursuant to the Day of Decision policy, she had to decide whether to voluntarily resign or create an immediate action plan "to correct her poor performance." (Peterson Decl. ¶ 19.) Denison was given until December 5, 2008, her next scheduled work day, to come up with an action plan. (Peterson Decl. ¶ 19.)

On December 5, 2008, Denison went on stress-related medical leave until January 4, 2009. (Denison Dep. 243:22-244:24; Gibson Decl. Ex. A at 209-12.)

On December 18, 2008, while Denison was on FMLA leave, Kaiser's Privacy and Security Compliance Manager, Rebecca Sherlock ("Sherlock"), received a call from Denison claiming that Fisher improperly accessed her HealthConnect medical record while investigating possible discipline related to her attendance. (Sherlock Decl. ¶ 6.)  Sherlock investigated the complaint and it was determined that Fisher did access Denison's HealthConnect record "one time [in October 2008], when he viewed the appointments screen. From that appointment screen, Mr. Fisher could only view

FINDINGS AND RECOMMENDATION    10

1 date and time information related to appointments. . . . No other
2 information is displayed on that screen, and he could not have seen
3 any other medical information or [protected health information] of
4 Ms. Denison." (Sherlock Decl. ¶ 6.) Sherlock indicates that, if
5 Fisher had accessed or viewed other portions of Denison's
6 HealthConnect record, it would have shown up in the audit.
7 (Sherlock Decl. ¶ 6.)

8    Sherlock concluded the investigation in mid-February 2009 and
9 informed Peterson of her findings. (Sherlock ¶ 7.) Fisher had
10 admitted to entering the appointments screen in Denison's
11 HealthConnect record to confirm when she was at a medical
12 appointment as part of an investigation into her attendance.
13 (Sherlock Decl. ¶ 7.) As a result, on February 19, 2009, Fisher
14 was issued a Level 2 Corrective Action for violating Kaiser's
15 confidentiality policies, *i.e.*, accessing medical records without
16 the specific purpose of providing medical care. (Sherlock Decl. ¶
17 7.) Neither Sherlock nor Peterson informed Denison of their
18 findings or the discipline handed down because such investigations
19 are considered confidential under Kaiser's policies. (Sherlock
20 Decl. ¶ 8; Sherlock Dep. 27:24-29:4, 50:7-52:4; Gibson Decl. Ex. A
21 at 223.)

22    When Denison returned to work, on or about January 5, 2009,
23 Peterson was able to hold the Day of Decision meeting with her,
24 along with Fisher, a Human Resource ("HR") representative, and
25 Denison's union representative. (Peterson Decl. ¶ 20.) Denison
26 decided to execute an action plan, but was informed "that she was
27 on Level 4 Corrective Action and that *any further infractions,*
28 *especially related to cash handling, could result in the*

FINDINGS AND RECOMMENDATION    11

1  *termination of her employment*."    (Peterson Decl. ¶ 20) (emphasis
2  added).

3      On or about March 24, 2009, Peterson learned that Fisher had
4  discovered that Denison failed to properly deposit her end-of-shift
5  cash bag into the safe the evening before.    (Peterson Decl. ¶ 24.)
6  Fisher informed Peterson that he discovered the bag hanging in the
7  tumbler of the safe and had another MIS, Rebecca Macalanda
8  ("Macalanda"), observe and witness the incident.    (Peterson Decl.
9  ¶ 24.)    That same day, a discovery meeting was held with all of the
10  pertinent parties.    (Peterson Decl. ¶ 25; Gibson Decl. Ex. A at
11  170.)    Peterson concluded that Denison "had probably engaged in
12  another violation of cash-handling policies by failing to properly
13  deposit the cash bag into the safe which violated the terms of her
14  Level 4 Corrective Action and last chance agreement[;]" however,
15  pursuant to Kaiser practice, Peterson investigated the matter
16  further.[3]    (Peterson Decl. ¶ 25.)    Denison's coworker, Susan
17  Tennant ("Tennant"), later informed Fisher that she was working
18  with Denison on the night of March 23 and served as a witness with
19  Denison when she deposited her cash bag at the end of the night.
20  (Peterson Decl. ¶ 26.)    Denison claims the cash bag was not
21  sticking out of the tumbler. (Denison Dep. 266:1-267:10.)    Tennant
22  claims "she double-checked and confirmed that Ms. Denison's cash
23  bag had indeed dropped into the safe."    (Peterson Decl. ¶ 26.)

_____

25      [3] Peterson's declaration points out that it would be
physically impossible for the bag to be in the tumbler if it had
26  dropped into the safe "because the safe is a dual-custody safe that
requires a member of the armored car company to be present to open
27  the safe[,]" which is how Peterson "knew that no one could have
taken Ms. Denison's cash bag out of the safe." (Peterson Decl. ¶
28  26.)

FINDINGS AND RECOMMENDATION    12

On March 25, 2009, the Department of Health and Human Services' Office of Civil Rights ("OCR") notified Kaiser's Compliance Manager, Delores Empey ("Empey"), Denison filed a complaint based on Fisher accessing her HealthConnect appointment screen. (Sherlock Decl. ¶ 9; Gibson Decl. Ex. A at 226-27.) Pursuant to Compliance Department investigation practice, Sherlock turned over the file relating to the incident to Empey so she could respond to the OCR complaint. (Sherlock ¶ 9.) Empey sent the OCR a letter in response on March 30, 2009, noting that Denison's complaint had "been investigated and corrective action applied to the supervisor who accessed and used the complainants' medical appointment information." (Sherlock Decl. Ex. D at 1.) The OCR dismissed the charge soon thereafter. (Sherlock Decl. ¶ 9, Ex. E.)

In April 2009, Peterson reviewed the facts regarding the March 23 cash drop with his supervisor Leonard, her supervisor Tracy Runge ("Runge"), and various HR representatives. (Peterson Decl. ¶ 27, Ex. G; Peterson Dep. 112:3-114:15.) Peterson also approached the HR Manager, Shawn Ferguson ("Ferguson"), to discuss Denison's situation in April 2009. (Ferguson Decl. ¶ 3.) Based on Ferguson's "review and discussions with Mr. Peterson, it was obvious that Ms. Denison had failed to properly deposit the cash bag, that it was a violation of Kaiser's cash-handling policies, and also a violation of her Level 4 Corrective Action and last chance agreement." (Ferguson Decl. ¶ 3.)

On May 4, 2009, Peterson met with Ferguson, and Labor Relations Managers Mary Elizabeth Harper ("Harper") and Kevin Dull ("Dull") to determine whether Denison's employment should be

FINDINGS AND RECOMMENDATION    13

1 terminated.   (Peterson Decl. ¶ 27.)   Peterson claims:

2     After they had each independently reviewed the case, both
    Mr. Dull and Ms. Harper separately decided that Ms.
3     Denison's employment should be terminated. . . . **Ms.**
    **Leonard and I discussed the case and, with HR's support,**
4     **both made the decision to terminate Ms. Denison's**
    **employment, effective the following day, May 5.** The
5     basis for the termination was Ms. Denison's violation of
    cash-handling policies while on a Corrective Action Level
6     4 primarily for earlier cash-handling violations. **Mr.**
    **Fisher helped provide factual information related to the**
7     **events for which Ms. Denison was terminated, but he was**
    **not involved in making the final decision to terminate**
8     **her employment.**

9 (Peterson Decl. ¶ 27) (emphasis added).[4]

10     Nate Taylor ("Taylor"), a HR consultant, did "not necessarily"

11 think Denison should be terminated, but did recommend she be

12 disciplined.   (Taylor Dep. 38:8-15, 49:12-14;Ferguson Decl. ¶ 2.)

13 Taylor does recall Harper recommending Denison be terminated.

14 (Taylor Dep. 38:12-22.)  However, Harper claims she "never told Mr.

15 Ferguson, Mr. Taylor, Brad Peterson, David Fisher, or any other

16 Kaiser manager or human resources employee that Jeanne Denison

17 should be terminated or that Kaiser should terminate Jeanne

18 Denison." (Harper Decl. ¶ 10.)

19     On May 5, 2009, prior to the start of her shift, Denison

20 called Fisher to inform him she would be using her intermittent

21 FMLA medical leave that day.  (Denison Dep. 275:4-280:1; Denison

22 Decl. ¶ 75.)  Later that morning, Fisher called Denison saying he

23 needed to speak with her, and Denison responded saying she was on

24 sick leave and that it was inappropriate for him to contact her on

25

26 _____

27    [4] Ferguson also claims that both Dull and Harper "agreed that
termination of Ms. Denison's employment was appropriate." (Ferguson
28 Decl. ¶ 3.)

FINDINGS AND RECOMMENDATION    14

1    a sick day, per Kaiser policy. (Denison Dep. 280:7-21; Denison

2    Decl. ¶ 76.) About an hour later, Denison contacted her primary

3    care provider about stress-related issues. (Denison Dep. 277:16-

4    278:6, 280:22-281:1.) Soon thereafter, Denison received a

5    telephone call from her shop steward, Mary Brooks ("Brooks"),

6    indicating that she had been terminated. (Denison Dep. 281:2-21.)

7    On or about May 11, 2009, Denison also received a letter from

8    Fisher confirming the termination of her employment. (Denison Dep.

9    282:6-10.)

10    Denison filed a second complaint with OCR on July 17, 2009,

11    alleging that Kaiser retaliated against her by terminating her

12    employment in May 2009 because she filed a prior complaint with

13    OCR. (Gibson Decl. Ex. I at 1.) OCR's Regional Manager, Linda Yuu

14    Connor ("Connor"), informed Kaiser that:

> [I]nformation OCR obtained from interviews with several
> Kaiser supervisors and managers, along with documentation
> that complainant had been placed on several levels of
> corrective action from June 2008 to May 2009, indicates
> that complainant's dismissal was due to work performance
> issues. . . . Thus, OCR has concluded that there is
> insufficient information to establish a casual connection
> between the protected activity and the adverse action
> taken. Accordingly, OCR has concluded that the
> complainant has not established a claim of retaliation[.]

(Gibson Decl. Ex. I at 1.)[5]

### Legal Standard

Summary judgment is appropriate "if pleadings, the discovery

and disclosure materials on file, and any affidavits show that

---

[5] Denison filed a charge with the Oregon Bureau of Labor and
Industries ("BOLI") on September 30, 2009. (Gibson Decl. Ex. A at
230-33. BOLI dismissed the charge and issued a right-to-sue letter
to Denison on or about September 1, 2010. (First Amended Complaint
("FAC") ¶ 3.)

FINDINGS AND RECOMMENDATION    15

1  there is no genuine issue as to any material fact and that the

2  movant is entitled to judgment as a matter of law." FED. R. CIV.

3  P. 56(c).  Summary judgment is not proper if factual issues exist

4  for trial.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

5  1995).

6      The moving party has the burden of establishing the absence of

7  a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477

8  U.S. 317, 323 (1986).  If the moving party shows the absence of a

9  genuine issue of material fact, the nonmoving party must go beyond

10  the pleadings and identify facts which show a genuine issue for

11  trial.  *Id.* at 324.  A nonmoving party cannot defeat summary

12  judgment by relying on the allegations in the complaint, or with

13  unsupported conjecture or conclusory statements.  *Hernandez v.*

14  *Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus,

15  summary judgment should be entered against "a party who fails to

16  make a showing sufficient to establish the existence of an element

17  essential to that party's case, and on which that party will bear

18  the burden of proof at trial." *Celotex*, 477 U.S. at 322.

19      The court must view the evidence in the light most favorable

20  to the nonmoving party.  *Bell v. Cameron Meadows Land Co.*, 669 F.2d

21  1278, 1284 (9th Cir. 1982).  All reasonable doubt as to the

22  existence of a genuine issue of fact should be resolved against the

23  moving party.  *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).

24  Where different ultimate inferences may be drawn, summary judgment

25  is inappropriate.  *Sankovick v. Life Ins. Co. of N. Am.*, 638 F.2d

26  136, 140 (9th Cir. 1981).

27      However, deference to the nonmoving party has limits.  The

28

FINDINGS AND RECOMMENDATION    16

1   nonmoving party must set forth "specific facts showing a genuine

2   issue for trial." FED. R. CIV. P. 56(e).  The "mere existence of

3   a scintilla of evidence in support of plaintiff's positions [is]

4   insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

5   (1986).  Therefore, where "the record taken as a whole could not

6   lead a rational trier of fact to find for the nonmoving party,

7   there is no genuine issue for trial." *Matsushita Elec. Indus. Co.,*

8   *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

9   quotation marks omitted).

## Preliminary Procedural Matters

11       Pursuant to Rule 6(b)(1)(B), Denison has moved the court for

12  an order enlarging the time for filing an Answer to the

13  counterclaims asserted by Kaiser.  (Docket No. 85.)

14       On November 19, 2010, Kaiser served its first request for

15  production. (Snyder Am. Decl. ¶ 6.) Denison's counsel (hereinafter,

16  "Snyder") delivered a disc containing all the records Denison had

17  in her possession that related to Kaiser's request on February 21,

18  2011.  (*Id.* ¶ 7.)  Soon thereafter, on February 28, 2011, Snyder

19  received a call from Kaiser's counsel (hereinafter, "Kitchel,"

20  "Alifanz," or "Pederson") claiming a Health Insurance Portability

21  and  Accountability  Act  ("HIPAA")  violation.   (*Id.*  ¶  7.)

22  Specifically, Kitchel informed Snyder that among the February 21

23  production  were  records  that  disclosed  HIPAA  protected  health

24  information. (*Id.* ¶ 7.)  Kitchel told Snyder that Denison could be

25  exposed to personal and/or criminal liability. (*Id.* ¶ 8.)

26       On March 3, 2011, Snyder wrote Alifanz, stating that "all

27  paper records that could be interpreted to contain protected health

28

FINDINGS AND RECOMMENDATION     17

1  information were being delivered, and that all electronic copies
2  containing the same would be destroyed." (*Id.* ¶ 9.)  In accordance
3  with the March 3 letter, Snyder delivered all bates stamped
4  documents that could be interpreted as HIPAA protected information;
5  his office shredded non-bates stamped versions of those records;
6  and all electronically scanned versions of those records were
7  destroyed. (*Id.* ¶ 9.)

8       On April 12, 2011, based on an unopposed motion for leave to
9  file an amended answer,[6] "Kaiser amended its answer alleging a new
10 Fifteenth Affirmative Defense of after acquired evidence, and
11 pleading that it learned Denison 'took' and 'provided' documents
12 containing 'protected health information.'" (*Id.* ¶ 10.)  Kaiser's
13 amended answer also set forth a counterclaim seeking monetary
14 damages for time incurred in "complying with the legal obligations
15 resulting from" Denison's breach of her confidentiality, and the
16 "second counterclaim reasserts the allegations of the new Fifteenth
17 Affirmative Defense, seeking a declaration that plaintiff's damages
18 'must cut off as of the date that termination would have
19 occurred.'" (*Id.* ¶ 10.)

20      As Kaiser points out, Snyder's answer to their counterclaims
21 was due 21 days later on May 3, 2011. (Kaiser's Resp. Pl.'s Mot.
22 Enlarge at 2.)  Snyder does not dispute this fact, rather Snyder
23 says he did not "file a reply to the Fifteenth Affirmative Defense

24

25      [6] On August 15, 2011, pursuant to another unopposed motion
26 for leave to file an amended answer, Kaiser filed its Second
   Amended Answer, Affirmative Defenses and Counterclaims. (*Id.* ¶
27 14.)  The alterations Kaiser made were unrelated to its April 12
   amendment. (*Id.*)
28

FINDINGS AND RECOMMENDATION   18

1  (or the other 14 affirmative defenses), and likewise believed that

2  he did not need to reply to, or answer, the counterclaims alleging

3  the same conduct." (Snyder Am. Decl. ¶ 11.)  Snyder now realizes

4  that he should have answered the counterclaims within 21 days of

5  April 12, 2011. (*Id.*)  Apparently, Snyder "was of the mistaken

6  view that [Denison] would set out her contentions disputing the

7  Fifteenth Affirmative Defense and counterclaims in the parties' Pre

8  Trial Order." (*Id.* ¶ 17.)

9      On August 29, 2011, Kaiser filed its motion for summary

10 judgment, wherein it affirmatively sought summary judgment on its

11 two counterclaims, pointing out that the allegations in its

12 counterclaims should be deemed admitted because Snyder never filed

13 an answer to those counterclaims. (Pedersen Decl. ¶ 4.) Notably,

14 in Denison's October 15, 2011 response to Kaiser's motion, Snyder

15 argued that a party is not required to file an answer to a

16 counterclaim under Rule 8(b)(6). (*Id.* ¶ 5.)  In its November 2,

17 2011 reply brief, Kaiser stated that a response to a counterclaim

18 is required under the Rules and reiterated the argument that the

19 allegations in its counterclaims should be deemed admitted. (*Id.*

20 ¶ 6.)  On that same day, "Snyder realized that an Answer needed to

21 be filed denying Kaiser's counterclaims" and "immediately tried to

22 confer with" Pederson. (Snyder Am. Decl. ¶ 17.)

23     Snyder left messages for Pederson that day and the next,

24 seeking a stipulation to Denison's filing of an answer to Kaiser's

25 counterclaims, due to his "oversight." (Pederson Decl. ¶ 7, Ex.

26 A.)  Pederson responded to Snyder on November 3 via email, stating

27 that she was out of town and would consider his request, but

28

"wanted to know more about the reason why he did not file an answer." (*Id.* ¶ 8.)   Snyder responded on November 4, stating, "[a]t the time, I didn't think an Answer was necessary." (*Id.* ¶ 9.)   Pederson responded on November 7, stating she "did not understand his position that an answer was not required, as the pleading rules unambiguously required an answer, and that, at any rate, he should [not] have made his request two months after the issue was first raised in Kaiser's motion for summary judgment." (*Id.* 11.)   Snyder responded a short time later, stating he "was not involved in the summary judgment response;" that he "had not read" Kaiser's motion for summary judgment; that he does not file answer to counterclaims "in all cases;" and that "[m]ost of the time, a Pre Trial Order is prepared which summarizes the pleadings." (*Id.*, Ex. B.)

Under Rule 6(b)(1)(B), "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made *after* the time has expired if the party failed to act because of *excusable neglect*."   FED. R. CIV. P. 6(b)(1)(B) (emphasis added).   In *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253 (9th Cir. 2010), the Ninth Circuit recognized that Rule(6)(b)(1), "like all the Federal Rules of Civil Procedure, is to be *liberally* construed to effectuate the general purpose of seeing that cases are tried *on the merits*."   *Id.* at 1258-59 (internal quotation marks, citation, and alteration omitted) (emphasis added).   While litigants will normally be granted an enlargement of time in the absence of bad faith or prejudice to the adverse party, "[e]ven when the extension is sought *after the time*

FINDINGS AND RECOMMENDATION     20

1    *limit has expired*, the good cause standard is satisfied *merely* upon

2    a showing of excusable neglect." *Cal. Trout v. F.E.R.C.*, 572 F.3d

3    1003, 1027 n.1 (9th Cir. 2009) (emphasis added).

4        In *Pioneer Inv. Serv. Co. v. Brunswick Assocs.*, 507 U.S. 380,

5    113 S. Ct. 1489 (1993), the Supreme Court stated:

6        Although inadvertence, *ignorance of the rules, or
         mistakes construing the rules do not usually constitute*

7        *'excusable' neglect*, *it is clear that* 'excusable neglect'
         *under Rule 6(b) is a somewhat* 'elastic concept' and is

8        not limited strictly to omissions caused by circumstances
         beyond the control of the movant.

9
     *Id.* at 392 (emphasis added).  In determining whether neglect is

10   excusable, the court considers four factors: "(1) the danger of

11   prejudice to the opposing party; (2) the length of the delay and

12   its potential impact on the proceedings; (3) the reason for the

13   delay; and (4) whether the movant acted in good faith." *Bateman v.*

14   *U.S. Postal Serv.*, 231 F.3d 1220, 1223-24 (9th Cir. 2000)).

15
         Snyder's apparent oversight, or misinterpretation, was is in

16   regards to Rule 12(a)(1)(B), which provides that, "[a] party must

17   serve an answer to a counterclaim or crossclaim within 21 days

18   after being served with the pleading that states the counterclaim

19   or crossclaim." FED. R. CIV. P. 12(a)(1)(B).  Courts have reached

20   varying conclusions when faced with a litigant's failure to comply

21   with Rule 12(a)(1).  For example, in *Parma Cmmty. Gen. Hosp. v.*

22   *Premier Anesthesia*, No. 1:09-CV-325, 2011 WL 108891 (N.D. Ohio Jan.

23   12, 2011), the court found that a "short delay in filing" an answer

24   to counterclaims constituted excusable neglect when there was no

25   allegation of prejudice to the adverse party or bad faith by the

26   plaintiff, and the proceedings were not impacted.  *Id.* at *2.

27       By contrast, in *Allstate Ins. Co. v. Administratia*

28

FINDINGS AND RECOMMENDATION      21

*Asigurarilor*, 163 F.R.D. 196 (S.D. N.Y. 1995), the court found no excusable neglect where counsel did not adhere to Rule 12(a)(1)(A)'s limit for filing an answer. In so holding, *Allstate* stated, "defense counsel's failure to understand the plain language of the Federal Rules of Civil Procedure does not constitute excusable neglect." *Id.* at 198 (citations omitted). However, *Allstate* also found it "painfully clear" that defense counsel's performance had been "appalling" and ordered her to appear "to show cause why th[e] Court should not impose Rule 11 sanctions[.]" *Id.* at 200.

As the Supreme Court has recognized, "Rule 6(b) gives the court *extensive flexibility* to modify the fixed time periods found throughout the rules, whether the enlargement is sought before or after the actual termination of the allotted time." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 906 n.7 (1990) (internal quotation marks and citation omitted) (emphasis added). I find that Snyder satisfied the Rule 6(b)(1) standard for obtaining an extension of time.

Even "when an actor *knowingly* misses a deadline but acts in good faith without any intention to prejudice the opposing party, manipulate the legal process, or interfere with judicial-making, the actor's delay is neglectful, but not intentional, and thus may be excusable." *Golf Sav. Bank v. Walsh*, No. 09-973-AC, 2010 WL 3222112, at *5 (D. Or. Aug. 13, 2010) (emphasis added). There is no dispute that Snyder has acted in good faith and lacked any intention to prejudice Kaiser. Snyder's good faith in this proceeding is demonstrated by his routine extension of normal

1  courtesies to his adversary, which contributed to Kaiser's April 12
2  addition of counterclaims.

3      The only prejudice Kaiser points to is the fact that Snyder's
4  motion "is nearly *seven months late*, and comes long after the close
5  of discovery (on July 10) and after all summary judgment briefing,
6  including  that  related  to  Kaiser's  counterclaims  has  been
7  completed." (Kaiser's Resp. Pl.'s Mot. Enlarge at 3.)  However, I
8  assign  this  consideration  little  weight  because,  according  to
9  Kaiser, at "*no time during discovery* did Plaintiff dispute" the
10 principle focus of their counterclaims, *e.g.*, whether Denison's
11 "conduct breached her obligations under *Kaiser's confidentiality*
12 *policies*,  and  that  Kaiser  would  have  terminated  Plaintiff's
13 employment immediately had its Compliance Department learned of her
14 conduct."  (*Id.*) (emphasis added).  Considering the apparent
15 strength of Kaiser's counterclaims on their merits, and the fact
16 that Snyder's motion to enlarge is being considered in conjunction
17 with Kaiser's motion for summary judgment, I foresee little, if
18 any, prejudice or negative impact on this proceeding.

19     Because Snyder acted in good faith, without prejudice, and
20 with minimal impact on this proceeding, his neglect was excusable.
21 Accordingly, Denison's Motion (Docket No. 85) to Enlarge Time to
22 File Answer to Counterclaims should be granted. With a responsive
23 pleading  having  been  filed,  the  allegations  in  Kaiser's
24 counterclaims should be addressed on their merits rather than
25 deeming them admitted under Rule 8(b)(6).
26 ///
27 ///
28

1                                **Discussion**

2 **I.   Kaiser's Motion (Docket No. 47) for Summary Judgment**

3      Denison alleges statutory claims against Kaiser, for violation
4 of the federal Family Medical Leave Act ("FMLA"), 29 U.S.C. §§
5 2601-2654, and its state law counterpart, the Oregon Family Leave
6 Act ("OFLA"), ORS 659A.150-.186. Denison also alleges state common
7 law claims for wrongful termination and invasion of privacy.  Her
8 final claim alleges whistleblower retaliation under ORS 659A.199.

9      Invasion of privacy is the only claim alleged against Fisher
10 personally and Kaiser.  Because Denison's invasion of privacy claim
11 against both Fisher and Kaiser are predicated upon the same
12 underlying conduct, Kaiser has joined in Fisher's motion for
13 summary judgment and supporting memoranda. (Kaiser's Mem. Supp. at
14 32.)  Accordingly, Kaiser's motion against Denison's invasion of
15 privacy claim will be addressed below with Fisher's motion for
16 summary judgment.

17      **A.   FMLA**

18      Pursuant to 29 U.S.C. § 2615(a), there are two distinct
19 theories for recovery on FMLA claims, that is, (1) the
20 "retaliation" *or* "discrimination" theory and (2) the "entitlement"
21 *or* "interference" theory.  *Sanders v. City of Newport*, 657 F.3d
22 772, 777 (9th Cir. 2011).

23      Denison's FMLA claim is brought under the
24 interference/entitlement theory only. (Mot. Summ. J. Hr'g Tr. 50,
25 Dec. 5, 2011) ("We only have an interference claim.") An
26 interference claim is based on an alleged violation of **§**
27 2615(a)(1), which states, "[i]t shall be unlawful for any employer

28

FINDINGS AND RECOMMENDATION    24

1  to interfere with, restrain, or deny the exercise of or the attempt
2  to exercise" the substantive rights guaranteed by FMLA.  29 U.S.C.
3  § 2615(a)(1).  Section "2615(a)(1) applies to employees who simply
4  take FMLA leave and as a consequence are subjected to unlawful
5  actions by their employer."  *Xin Liu v. Amway Corp.*, 347 F.3d 1125,
6  1134 n.7 (9th Cir. 2003).

7  This circuit does *not* apply the burden shifting framework
8  delineated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792
9  (1973), to FMLA interference claims.  *Sanders*, 657 F.3d at 778.
10  Instead, the plaintiff-employee can "prove this claim, as one might
11  any ordinary statutory claim, by using either direct or
12  circumstantial evidence, or both."  *Id.* (citation omitted).  The
13  employee must establish that: (1) she was eligible for FMLA's
14  protections, (2) her employer was covered by the FMLA, (3) she was
15  entitled to leave under the FMLA, (4) she provided sufficient
16  notice of her intent to take leave, and (5) her employer denied her
17  FMLA benefits to which she was entitled."  *Sanders*, 657 F.3d at 778
18  (citing *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)).[7]

19  When "an employer defends against an interference claim," he
20  must demonstrate "a legitimate reason to deny an employee
21  reinstatement."  *Id.* at 779-80; *see also Edgar v. JAC Prods., Inc.*,

22  _____

23  [7]   Within her complaint, Denison alleges that, "Defendant
   Kaiser interfered . . . against Plaintiff for taking and/or
24  requesting medical leave by taking adverse employment actions
   against Plaintiff, including, but not limited to, intermediate
25  discipline and then terminating her employment with Defendant
26  Kaiser."  (FAC ¶ 55.)  Whether Denison is attempting to proceed on
   the theory that Kaiser failed to reinstate her following FMLA leave
27  or used the taking of FMLA leave as a negative factor in any
   employment action, her claim is only an "interference" claim.
28

FINDINGS AND RECOMMENDATION     25

1  443 F.3d 501, 508 (6th Cir. 2006) ("Both the statute and the DOL

2  regulation likewise establish that interference with an employee's

3  FMLA rights does not constitute a violation if the employer has a

4  legitimate reason unrelated to the exercise of FMLA rights for

5  engaging in the challenged conduct.")

6      DOL regulation 29 C.F.R. § 825.216(a) provides, in pertinent

7  part, that, "if an employee is laid off during the course of taking

8  FMLA leave . . . [the] employer would have the burden of proving

9  that an employee would have been laid off during the FMLA leave

10 period and, therefore, would not be entitled to restoration."  29

11 C.F.R. § 825.216(a)(1).

12     The Ninth Circuit has recognized this limitation, stating,

13 "[a]lthough the FMLA generally confers the right to reinstatement,

14 an employer may still terminate an employee during her leave if the

15 employer would have made the same decision had the employee not

16 taken leave." *Gambini v. Total Renal Care, Inc.,* 486 F.3d 1087,

17 1097 (9th Cir. 2007) (citing 29 U.S.C. § 2614(a); 29 C.F.R.

18 825.216(a)(1)).  That is to say, the employee is terminated for

19 conduct unrelated to FMLA leave. *Sanders*, 657 F.3d at 779.  The

20 obvious implication being that an employer is precluded from using

21 FMLA leave as a "negative factor" in reaching its decision to

22 terminate.  *See* 29 C.F.R. § 825.220(c) (noting that, "employers

23 cannot use the taking of FMLA leave as a negative factor in

24 employment actions, such as hiring, promotions or disciplinary

25 actions").

26     Here, there are no material facts which are genuinely

27 disputed.  Whether Denison's claim is analyzed as alleging Kaiser

28

FINDINGS AND RECOMMENDATION    26

interfered with Denison's rights under the FMLA, either by denying or discouraging her from using leave, by disciplining her, or by considering her use of leave as a negative factor in her termination, Kaiser has presented evidence indicating that Denison's employment record, when viewed as a whole, shows a long history of objective complaints and discipline.

As an initial matter, it is noteworthy that Denison brings this action pursuant to § 2615(a)(1), the provision governing interference with substantive rights. *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001) ("holding that a claim by a former employee that he was denied use of FMLA leave is a claim of substantive right, covered under [§ 2615](a)(1), and not (a)(2)" (citing *Diaz v. Ft. Wayne Foundry Corp.*, 131 F.3d 711, 712 (7th Cir. 1997))). As *Diaz* explained, FMLA substantive right claims "'do not depend on discrimination'" since the issue is "'not that the employer treated one employee worse than another' but that every employee has substantive rights under FMLA that the employer must respect." *Amway*, 347 F.3d at 1136 (quoting *Diaz,* 131 F.3d at 712).

Setting forth the timeline of events leading to Denison's termination is instructive. With the caveat that "an employer is not required to cease pursuing a disciplinary course of action against an employee that began before that employee took FMLA-leave, simply because that employee took leave." *Swan v. Bank of Am.*, 360 Fed. Appx. 903, 906 (9th Cir. 2009). The relevant pre-termination events were:

- • July 18, 2007, Denison's performance evaluation

FINDINGS AND RECOMMENDATION    27

from her previous supervisor, Wood, indicated
Denison "occasionally has difficulties with
communication, particularly with her co-workers.
[Some] occasional patient complaint[s]."

- In late July 2007, Fisher becomes Denison's supervisor.
- October 19, 2007, Denison receives a performance evaluation from Fisher that indicated she had communication and teamwork issues.
- November 25, 2007, Leonard filed a complaint against Denison which indicated that she was "not pleasant" to a patient and failed to collect pertinent billing information. Leonard's complaint led to a Level 1 Corrective Action being issued to Denison on December 7, 2007.
- January 2008, Kaiser implements cash-handling policy imposing greater responsibilities on each MIS.
- February 25, 2008, Fisher sent Denison an email indicating that her cash drawer balancing was off "too often."
- March 23, 2008, Denison contacted Kaiser's Compliance Hotline to report that Fisher was not giving her breaks during twelve hour shifts.
- On or about May 26, 2008, Trinette Talamantes and Erin Padden discovered unreported cash transactions that had been in Denison's till locker for a couple

FINDINGS AND RECOMMENDATION     28

months.[8]

- June 11, 2008, Denison received a Level 1
  Corrective Action for the May 26, 2008 unreported
  cash transaction in her locker.

- June 23, 2008, Denison made her first request for
  FMLA leave.[9]

- July 7, 2008, Rita Townley discovered Denison's
  start-up fund was left at her desk in violation of
  Kaiser's cash-handling policies.    As a result,
  Denison received a Level 2 Corrective Action on
  July 30, 2008.

- On July 12, 2008, Kaiser informed Denison she was
  "eligible for Family Leave as of 6/23/08," thereby
  entitling her to 432 leave hours in the following
  twelve months.

- September 5, 2008, Fisher found unreported cash in
  Denison's till locker and had Woodward confirm his
  finding.

- In  October  2008,  Fisher  accessed  Denison's
  HealthConnect record.

- October 27, 2008, Fisher gives Denison a negative
  performance review, indicating that she continued
  to  fail  to  meet  expectations  in  several  areas,

---

[8] (Denison Dep. 98:21-102:14.)

[9]  It is not entirely clear when, or if, Denison took FMLA
after making this request.  Kaiser's response on July 12, 2008,
seems to indicate that it was only an eligibility determination.

1    including cash handling.

2    •    In late October 2008, Peterson learned from Fisher
3         that Denison had placed the wrong patient wrist
4         band on two separate patients she was checking into
5         the Urgent Care on October 26 and 2007, 2008.[10]

6    •    November 13, 2008, Thurber discovers Denison left
7         her key in her unlocked till locker.

8    •    November 20, 2008, Denison submitted a FMLA
9         recertification request which was approved by
10        Kaiser on November 26, 2008.[11]

11   •    December 2, 2008, the parties schedules finally
12        align in order for a discovery hearing to take
13        place regarding the September 5 and November 13
14        till locker incidents, and the wristband mixups on
15        October 26 and 27. Denison is issued Level 3 and 4
16        Corrective Actions, respectively. Denison is given
17        until December 5, 2008, her next scheduled work
18        day, to come up with an action plan pursuant to
19        Kaiser's Day of Decision policy.

20   •    December 5, 2008, Denison takes one-month of FMLA
21        leave.

22   _____

23        [10]  According to Peterson, despite Denison's denial, "[b]ased
24   on my investigation and based on the discovery meeting with
     [Denison], I was convinced that [Denison] had, indeed, failed to
25   put the correct wrist band on those patients."  (Peterson Supp.
     Decl. ¶ 6; Gibson Decl. Ex. A at 168.)

26
     [11]  The record suggests that Denison's November 20 request was
27   merely a recertification and that she did not, in fact, take FMLA
     leave until December 5, 2008.

28

- December 18, 2008, Denison complains to Kaiser's Privacy and Security Compliance Manager that Fisher improperly accessed her HealthConnect medical record.
- January 5, 2009, rather than resign, Denison created an action plan and agreed to a last chance agreement.
- March 24, 2009, Fisher discovers Denison's cash bag hanging in the tumbler of the safe and has Macalanda serve as a witness.[12]
- March 25, 2009, OCR notified Empey that Denison had filed a complaint based on Fisher accessing her HealthConnect appointment screen in October 2008.
- May 4, 2009, Peterson and Leonard decide to terminate Denison's employment effective May 5, 2009.
- May 5, 2009, Denison takes one-day medical leave before she claims to have been notified of her termination.

The gist of Denison's claim is that she had a stellar employment history and, upon becoming her supervisor, Fisher began targeting her with frivolous disciplinary measures only after she gave notice of her intent to take FMLA-related leave. This record does not support such allegations.

---

[12] Because the safe is dual-custody, Peterson knew that "no one could have taken Ms. Denison's cash bag out of the safe." (Peterson Decl. ¶ 11.)

FINDINGS AND RECOMMENDATION    31

1    Kaiser concedes that Denison: (1) disputes whether she placed
2  the wrong patient wristbands on two patients in October 2008, which
3  formed one of the bases for her Level 4 Corrective Action; and (2)
4  disputes that she improperly deposited her cash bag on March 23,
5  2009. Kaiser argues these disputes are not material disputes of
6  fact precluding summary judgment. I agree.

7    In *Denny v. Union Pac. R. Co.*, 173 Fed. Appx. 549 (9th Cir.
8  2006), the employee had brought an FMLA interference claim and
9  disputed the events underlying the incident which led to his
10 termination. *Id.* at 550. *Denny* appropriately observed that the
11 question is only whether the employer fired him based on their
12 assessment of the terminable offense, "rather than for a reason
13 prohibited by the FMLA." *Id.* at 551 ("noting that it is unimportant
14 whether the employer's otherwise permissible reasons for a
15 termination were wrong, so long as it honestly believed them"
16 (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F. 3d 1054, 1063
17 (9th Cir.2002))).

18    Even viewing the evidence in the light most favorable to
19 Denison, her supervisor prior to Fisher gave her a performance
20 evaluation which indicated that she had difficulties communicating
21 with co-workers and was the subject of some "patient complaint[s]."
22 Additionally, Leonard's complaint, which involved cash handling
23 procedure, came in November 2007 and resulted in a Corrective
24 Action. Within six months of Kaiser implementing its new cash
25 handling policy in January 2008, Denison had two more cash handling
26 problems, one of which resulted in another Corrective Action, all
27 prior to her first FMLA leave request. Thereafter, she had four
28

FINDINGS AND RECOMMENDATION    32

more cash handling problems and the two wrist band incidents. Given the fact that Denison received warnings, training, and discipline prior to requesting FMLA leave, and that these problems continued unabated thereafter, coupled with her being given every FMLA leave she requested, no reasonable juror could conclude that the Corrective Actions resulted from her use of FMLA leave.

Denison claims that "the timing of the discipline meted out" to her is "uncanny." However, it inescapable that each of her requests for FMLA leave were preceded by various Kaiser employees, most often not Fisher, disclosing and/or discovering her cash handling policy violations. In October 2007, Denison signed a Cash Handling Agreement and she has testified that cash handling was essential to the performance of her MIS duties. That agreement indicates that:

> The purpose of this cash handling responsibility agreement is to confirm in writing that you are informed of, and understand, the Northwest Medical Operations Business Services Cash Handling Policies and Procedures and that you are aware of your responsibilities.
>
> ***
>
> [F]ailure to follow these guidelines, *even without demonstration of actual loss*, shall result in the utilization of the Issue Resolution Corrective Action process up to and including termination.

(Gibson Decl. Ex. 9) (emphasis added). The policy seems clear. The gravity of the harm that results has no bearing on whether a violation should result in discipline. It is not a situation where "no harm equals no foul" as Denison alleges.[13]

---

[13]   (*But see* Pl.'s Mem. at 23) ("No money was missing, and no harm was alleged by anyone.")

FINDINGS AND RECOMMENDATION     33

1    It is true that, despite being on a last change agreement,
2  Taylor believed Denison should be disciplined, but "not
3  necessarily" terminated, and Harper claims she did not support the
4  decision to fire her.[14]  Nonetheless, Labor Relations Manager Dull
5  and HR Manager Ferguson's assessments have not been contradicted,
6  nor has the fact that Peterson and Leonard, the ultimate decision
7  makers, thought termination was warranted.

8    It is significant that Peterson and Leonard made the decision
9  to terminate Denison before she sought leave on May 5.   In
10 *Santrizos v. Evergreen Fed. Sav. and Loan Assoc.*, No 06-886-PA,
11 2007 WL 3544211 (D. Or. Nov. 14, 2007), the defendants argued,
12 amongst other things, that they were entitled to summary judgment
13 on plaintiff's FMLA interference claim since he was terminated for
14 reasons independent of his request for leave.  *Id.* *5-7.  Citing
15 *Gambini*, Judge Panner determined that, even if defendant altered
16 plaintiff's effective termination date "because he requested leave,
17 defendants have shown that the decision to terminate plaintiff was
18 made *before* and *independently* of plaintiff's request for medical
19 leave."  *Id.* at *7 (emphasis added).

20    In short, the FMLA's anti-interference provision bars conduct
21 that "tends to chill" an employee's willingness to exercise their
22 rights.  *Bachelder*, 259 F.3d at 1124.   Nothing in the record
23 supports the fact that Kaiser interfered with or restrained
24 Denison's freedom to exercise her substantive rights.  Accordingly,
25 Kaiser is entitled to summary judgment on Denison's FMLA claim.

26

27    [14]  Taylor, like Peterson and Ferguson, says Harper recommended
28 Denison's termination.

FINDINGS AND RECOMMENDATION    34

**B.   OFLA**

Because the parties agree Denison's OFLA claim is subject to the same analysis as her FMLA claim pursuant to ORS 659A.186(2), my analysis of Denison's FMLA claim applies equally to her OFLA claim.[15]  *See also Sanders*, 657 F.3d at 783 (noting similarities between OFLA and FMLA reinstatement rights, which makes it proper to apply the same legal standards under FMLA to an OFLA claim).

**C.   Wrongful Discharge**

Denison has also asserted a claim for wrongful discharge based on two theories: (1) that she was wrongfully terminated for exercising an employment related right to take medical leave; and (2) that she was discharged for reporting that her HealthConnect record was accessed in violation of HIPAA.  (Pl.'s Resp. at 37.)

Wrongful discharge claims require the presence of a "causal connection between a protected activity and the discharge." *Estes v. Lewis and Clark Coll.*, 152 Or. App. 372, 381, 954 P.2d 792 (1998).  The employee's protected activity must have been a "substantial factor" in the decision to terminate the employee, *e.g.*, the employer's wrongful purpose must have been a factor that made a difference in the discharge decision. *Id.* (citation and quotation marks omitted).

Here, Kaiser fired Denison for repeated failures to comply with company policy.  It is undisputed that, prior to filing her internal hotline or OCR complaint, Denison had accumulated a sufficient number of Corrective Actions to be placed on a last chance agreement, thus requiring her to choose between resigning or

---

[15]   (Pl.'s Mem. at 25; Kaiser's Mem. Supp. at 20.)

FINDINGS AND RECOMMENDATION     35

1  creating an action plan. Kaiser also did not receive notice of
2  Denison's OCR complaint until after she violated her last chance
3  agreement.  There is no evidence from which a jury could find that
4  any protected activity was a "substantial" contributing factor in
5  Denison's termination.  Nor is there an issue of fact whether
6  Kaiser interfered with Denison's rights under FMLA.  Thus, Kaiser
7  is entitled to summary judgment on Denison's wrongful discharge
8  claim.  *See Santrizos*, 2007 WL 3544211, at *8 (similarly resolving
9  summary judgment on FMLA interference and wrongful discharge
10 claim).

11      **D.  Whistleblower Retaliation**

12      Denison's cause of action for whistleblower retaliation is
13 premised on her reporting that Fisher and Thurber impermissibly
14 accessed her HealthConnect record.  (FAC ¶¶ 96-97.) [16]

15      In Oregon, "[i]t is an unlawful employment practice for an
16 employer to discharge, demote, suspend or in any manner
17 discriminate or retaliate against an employee with regard to . . .
18 conditions or privileges of employment for the reason that the
19 employee has in good faith reported information that the employee
20 believes is evidence of a violation of a state or federal law[.]"
21 OR. REV. STAT. § 659A.199(1).

22      At the summary judgment stage, Denison must demonstrate the
23 existence of facts from which a reasonable factfinder could

24

---

25      [16]  Denison "is not asserting any claims for retaliation for
26 asserting wage claim violations. She's not alleging a claim for
   retaliation follow[ing] testifying in a workers' compensation
27 hearing;" rather "she was whistleblowing regarding [Fisher]
   accessing her medical records[.]" (Hr'g Tr. 35.)
28

FINDINGS AND RECOMMENDATION     36

1   conclude that she engaged in protected activity and that Kaiser
2   retaliated against her in response to that activity. *Merrill v.*
3   *M.I.T.C.H. Charter Sch. Tigard*, 2011 WL 1457461, at *7 (D. Or. Apr.
4   4, 2011) ("[I]f the employer asserts a non-discriminatory reasons
5   for the employee's termination, the plaintiff must show that the
6   employer would not have made the same decision absent a
7   discriminatory motive." (citing *El-Hakem v. BJY Inc.*, 415 F.3d
8   1068, 1076 (9th Cir. 2005))).

9       In *Franklin v. Clarke*, 2011 WL 4024638 (D. Or. Sept. 9, 2011),
10  there was evidence that employee would not have been terminated
11  "but for" the protected activity at issue, which demonstrated "that
12  Defendants' reason for terminating Plaintiff was pretextual." *Id.*
13  at *10. The converse is true here. Again, it is undisputed that
14  Denison compiled a sufficient number of Corrective Actions to be
15  placed on a last chance agreement prior to any HIPAA complaint. And
16  in any event, Peterson and Leonard, whose motives have not been
17  questioned, made the decision to terminate Denison based on her
18  disciplinary history. No reasonable trier of fact could conclude
19  Kaiser would not have made the same decision absent a
20  discriminatory motive.

21      Accordingly, Kaiser is entitled to summary judgment as to
22  Denison's whistleblower retaliation claim.[17]

23  **E.   Kaiser's Counterclaims**

24      It is undisputed that Denison kept a binder in her locker

25

26  ───────────────

27  [17]   Based on the insufficiency of Denison's claim on its
     merits, I decline to address whether ORS 659A.199 applies
28  retroactively.

FINDINGS AND RECOMMENDATION    37

1 containing hundreds of records on over 700 Kaiser members, and had
2 her daughter remove this binder to her home after being terminated.
3 (Denison Dep. 49:20-61:19; Peterson Dep. 135:20-137:5, 145:14-
4 147:1, 154:2-155:14; Sherlock Decl ¶¶ 11-13.) The records included
5 individually identifiable PHI under Kaiser's confidentiality
6 policies, including medical record numbers and identifying
7 information, credit card numbers, and payment information. (*Id.*)
8 Regardless of whether others ever viewed or used the documents, the
9 mere copying and removal may have constituted violations of
10 Kaiser's confidentiality policies because employees may not access,
11 copy, remove, or disclose PHI without a job-related reason relating
12 to providing care to that patient. (Sherlock Decl. ¶¶ 2-4, 13.)

13    As a result, Kaiser counterclaims for (1) damages resulting
14 from Denison's breach of the confidentiality agreement, and (2) a
15 declaratory judgment that Denison's damages are cut off from the
16 date of her breach. (Am. Answer ¶¶ 60-63.)

17    Kaiser claims Denison "was bound by the Confidentiality
18 Agreement she signed (P. Dep. Ex. 6), which plainly creates
19 contractual obligations for" Denison. (Kaiser's Mem. Supp. at 32.)
20 Exhibit 6 is a confidentiality agreement Denison signed on March
21 15, 2007, which provides, "[i]f I violate the agreements in this
22 document, I will be breaking my obligations to Kaiser Permanente I
23 may face corrective action. This may include losing my job, having
24 my contract or other relationship terminated, or other consequences
25 allowed by the law." (Sherlock Decl. Ex. B at 2; Gibson Decl. Ex.
26 A at 67-68.)

27    In support of its position, Kaiser cites *Fleming v. Kids & Kin*
28

FINDINGS AND RECOMMENDATION    38

*Head Start*, 71 Or. App. 718, 693 P.2d 1363 (1985) and *Simpson v. W. Graphics Corp.*, 293 Or. 96, 643 P.2d 1276 (1982), for the proposition that an "employer's unilaterally adopted policies can create binding contractual obligations for employee[s]." (Kaiser's Mem. Supp at 32.)   Neither case demonstrates that Kaiser is entitled to summary judgment on its breach of contract theory.

In *Fleming*, the issue on appeal was the sufficiency of the complaint. *Fleming*, 71 Or. App. at 720.   The plaintiff-employee alleged "that defendant terminated her employment without just cause, in violation of a provision of its employee handbook *which was part of her contract of employment*."   *Id*. (emphasis added). Similarly, in *Simpson*, the parties agreed that the terms of an employee handbook were contractual terms of the plaintiffs' employment. *Simpson*, 293 Or. at 99-100.   Like *Fleming*, *Simpson* was primarily concerned with issues involving a just cause provision in an employment contract.   *Id.* at 100.

Denison has stated, "my employment was subject to a collective bargaining agreement between my union and Kaiser. I know of no other employment contract that I entered into with Kaiser." (Denison Decl. ¶ 5.)   Denison's counsel represented during oral argument that the confidentiality agreement is

> simply a document that Ms. Perez Denison was asked to sign with a ton of other documents that were routinely signed. There is no evidence that it was bargained for. In fact, Ms. Perez Denison was subject to a collective bargaining agreement. There is no evidence [that] the confidentiality agreement was part of the collective bargaining agreement. In fact, it looks like it's outside of that collective bargaining agreement.

(Hr'g Tr. 30.)   However, nothing in the record indicates whether the March 2007 confidentiality agreement was, or was not, part of

FINDINGS AND RECOMMENDATION     39

the collective bargaining agreement, or any other alleged employment contract.

In any event, it is well settled that Oregon subscribes to the objective theory of contracts, which means

> that whether the parties entered into an agreement does not depend on whether the parties had the same subjective understanding of their agreement, that is, on whether their 'minds met' on the same understanding. Rather, it depends on whether the parties agreed to the same, express terms of the agreement, and on whether those terms constitute an enforceable agreement.

*City of Canby v. Rinkes*, 136 Or. App. 602, 902 P.2d 605, 610 (1995).

At the outset, I must point out that Kaiser relies on cases which are factually distinguishable from this case. Neither *Fleming* nor *Simpson* involved a breach of contract claim brought by the employer against the employee. These cases better support the proposition that an employer's unilaterally adopted policies can create binding contractual obligations for the employer, not the employee.

Here, Denison had previously signed a Confidentiality Statement on January 13, 1999, which generally prohibited disclosures similar to that of the March 2007 Confidentiality Agreement. While the Confidentiality Statement referenced the fact that an employee could be terminated for violating its terms, it made no mention of being able to impose "other consequences allowed by the law." The "modification" of the form in 2007 by Kaiser is not, when viewed objectively, an enforceable contract from which consequential damages may flow.

Simply put, this record does not suggest the two forms of

FINDINGS AND RECOMMENDATION    40

1 confidentiality agreement were intended as objective manifestations
2 of a contract by which Denison agreed not to disclose the
3 information.  Likewise the record recites no consideration for such
4 an agreement.  This contract formation issue is a question of law.
5 *Real Estate Loan Fund v. Hevner*, 76 Or. App. 349, 355, 709 P.2d 727
6 (1985). I find that no contract has been formed.  Objectively what
7 this amounts to is an employer getting an employee to acknowledge
8 he or she has been advised of one of the policies or rules they
9 must observe as employees.   There is no manifestation of a
10 contractual agreement to subject oneself to damages claimed by the
11 employer for a violation.

12     Even if one could say a contract was formed, there is no
13 objective manifestation of an agreement to be liable for
14 consequential damages.  Again the terms of the alleged contract are
15 an issue of law.  *Kabil Developments Corp. v. Mignot*, 279 Or. 151,
16 156-58, 566 P.2d 505 (1977).  At the very best for Kaiser, its
17 document is ambiguous and I construe it against Kaiser on this
18 issue.

19     In summary, Kaiser's motion for summary judgment as to their
20 counterclaim for damages resulting from Denison's alleged breach of
21 the confidentiality agreement should be denied. I need not address
22 whether Denison's damages would be cut off under the after-acquired
23 evidence doctrine, because (1) all claims stemming from Denison's
24 termination should be dismissed; and (2) Denison's invasion of
25 privacy claim does not implicate the after-acquired evidence
26 doctrine.
27 *///*
28

FINDINGS AND RECOMMENDATION     41

1      **F.    Evidentiary Objections**

2          Kaiser has objected to several portions of seven of the

3      declarations Denison offers in support of her response to

4      Defendants' motions for summary judgment.    Kaiser specifically

5      objects to the Tennant Declaration; the Lindgren Declaration;

6      Paragraphs 9 and 17-20 of the Brooks Declaration; Paragraphs 6, 8,

7      10-14, and 18 of Danielle Denison's Declaration; Paragraphs 10-13

8      of the Leach Declaration; and Paragraphs 7-9 of the Harper

9      Declaration.  (Kaiser's Objection Pl.'s Evidence ("Kaiser's

10     Objections") (Docket No. 82) at 5-7.)    Kaiser also alleges that

11     Paragraphs 1-22, 27-28, 36-38, 45-51, 55-59, and 65-78 of Denise

12     Denison's Declaration are irrelevant.  (Kaiser's Objections at 8.)

13         While Kaiser is specific in some instances, a majority of

14     their objections are extremely broad and lack any meaningful

15     clarity.  Kaiser claims that "most" or "the vast majority" of every

16     declaration "is inadmissible, because the statements are

17     irrelevant, based on hearsay, vague and nonspecific, and lack

18     foundation or are not based on first-hand knowledge."  (Kaiser's

19     Objections at 5-8.)  As Denison's counsel points out:

20         Defendant Kaiser presents no specific evidentiary
           objection to any discrete statement made by any of the
21         witnesses in their declarations.  Instead, defendant
           Kaiser elects to make conclusory objections that 'most'
22         of their declarations are inadmissible for various
           reasons without bothering to point the Court or Plaintiff
23         to portions of the declarations are objectionable for
           which reasons.    All witnesses provided declaration
24         testimony based upon their personal knowledge, the
           testimony is relevant and probative, thus, the Court
25         should consider it.

26     (Pl.'s Resp. Defs.' Evidentiary Objections (Docket No. 83) at 6.)

27         I agree with Denison's counsel and will not address any broad

28

FINDINGS AND RECOMMENDATION      42

or non-specific objection.  *See Melendez v. Morrow County Sch. Dist.,* Civ. No. 07-875-AC, 2009 WL 4015426, at *9 (D. Or. Nov. 19, 2009) (declining "to sift through the extensive material cited and speculate as to what material is objectionable and which objection Defendants wish to apply to a particular piece of evidence."); *see also Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 579 (2d Cir. 1969) (recognizing that a party "should state specifically the portions of the affidavit to which objection is being made," rather than "swing its bludgeon wildly.")

While I am mindful of the fact that "[d]efects in evidence submitted in opposition to a motion for summary judgment are waived absent a motion to strike or other objection," *FDIC v. N.H. Ins. Co.,* 953 F.2d 478, 484 (9th Cir. 1991) (citation and quotation marks omitted), not all "objections are necessary, or even useful, given the nature of summary judgment motions in general[.]" *Burch v. Regents of the Univ. of Cal.,* 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).  For example, "objections to evidence on the ground that it is irrelevant, speculative, . . . or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself[.] . . . A court can award summary judgment only when there is no genuine dispute of *material* fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant." *Id.* (emphasis in the original).  Factual allegations that fell into one or more of these categories had no bearing on my summary judgment analysis.

That said, given the substantial amount of deposition testimony submitted by both parties in support of their respective

FINDINGS AND RECOMMENDATION    43

1  positions, any necessary rulings on Kaiser's evidentiary objections
2  should be denied as moot, because the evidence moved against does
3  not change the recommendation that Kaiser's motions (with the
4  exception of the invasion of privacy claim) should be granted. *See*
5  *Ross v. Indep. Living Res. of Contra Costa*, No. C08-00854 TEH, 2010
6  WL 2898773, at *2 n.1 (N.D. Cal. July 21, 2010) (same); *see also*
7  *Burch*, F. Supp. 2d at 1124 (declining "to rule on admissibility
8  because, in a serendipitous turn of events, it found it unnecessary
9  to rely on" the objectionable exhibits).   None of the evidence
10 moved against was relied upon in evaluating Denison's invasion of
11 privacy claim against Kaiser. Kaiser's evidentiary objections
12 should also be denied as moot on this ground.

13 **II.  Fisher's Motion (Docket No. 48) for Summary Judgment**

14      **A.   Invasion of Privacy**

15      Denison's cause of action for invasion of privacy is premised
16 on Fisher impermissibly accessing her HealthConnect record. (FAC
17 ¶¶ 87-89.)  The claim is also alleged against Kaiser.

18      Oregon recognizes four separate theories which comprise the
19 tort of invasion of privacy: (1) intrusion upon seclusion; (2)
20 appropriation of another's name or likeness; (3) false light; and
21 (4) publication of private facts.   *Mauri v. Smith*, 324 Or. 476,
22 482, 929 P.2d 307 (1996).   Plaintiff relies on the theory of
23 "intrusion upon seclusion" in this case. (*See* Pl.'s Resp. at 39.)
24 To establish this claim, Denison must prove "three elements: (1) an
25 intentional intrusion, physical or otherwise, (2) upon the
26 plaintiff's solitude or seclusion or private affairs or concerns,
27 (3) which would be highly offensive to a reasonable person." *Mauri*,

28

FINDINGS AND RECOMMENDATION     44

1  324 Or. at 483.

2      Under Oregon law, "an actor commits an intentional intrusion
3  if the actor either desires to cause an unauthorized intrusion or
4  believes that an unauthorized intrusion is substantially certain to
5  result from committing the invasive action in question." *Id.*
6  Fisher does not dispute whether he intentionally accessed Denison's
7  HealthConnect record in violation of Kaiser's confidentiality
8  policies, nor does counsel contest this element.

9      "The second element of this tort is that the intentional
10  intrusion must be upon the plaintiff's solitude or seclusion of
11  private affairs or concerns." *Id.* at 485.  Fisher argues that the
12  second element is not met because information that has already been
13  disclosed is no longer "private." (Fisher's Mem. at 7.)  Fisher is
14  referencing the fact that Denison disclosed to her coworkers that
15  she was "going to see [her] doctor"; that the Department
16  Appointments Report ("DAR"), which Fisher and other MIS's had
17  access to, displayed information regarding her appointment; and
18  that he received an email from Denison confirming her appointment
19  and procedures. (Fisher's Mem. at 3-4.)

20      Fisher relies almost exclusively on *McLain v. Boise Cascade
21  Corp.*, 271 Or. 549, 533 P.2d 343 (1975).  There, the employee was
22  suspected of submitting fraudulent workers' compensation claims,
23  which prompted the employer to hire a private investigator.  *Id.* at
24  551-52.  The investigator crossed plaintiff's property line on
25  numerous occasions to photograph him in various activities around
26  his residence.  *Id.* at 552-54.  After recognizing the social
27  utility of exposing fraudulent claims, *id.* at 555, the Oregon

28

FINDINGS AND RECOMMENDATION     45

1  Supreme Court held that "the court properly granted a nonsuit" for
2  invasion of privacy, noting that "plaintiff conceded that his
3  activities which were filmed could have been observed by his
4  neighbors or passersby on the road running in front of his
5  property." *Id.* at 556.

6      I find Fisher's reliance on *McLain* unpersuasive. During oral
7  argument, Fisher's counsel claimed that for the purposes of the
8  tort of invasion of privacy "the question is not was it obtained
9  from a health record . . . The question is when somebody says to a
10 coworker[], I'm going to the doctor this morning . . . could there
11 be a reasonable expectation that [this] information somehow remains
12 private, notwithstanding the disclosure that I've just made."
13 (Hr'g Tr. 65.)   This argument misses the mark entirely.   Third
14 parties cannot access a patient's medical records "without signed
15 authorization that is in compliance with the Release of Information
16 policies[.]" (Gibson Decl. Ex. A at 64; Denison Dep. 42:9-44:17.)
17 As Kaiser's HIPAA compliance manager so aptly put it, "[b]ecause
18 Mr. Fisher did not have authorization from Ms. Denison to access
19 her medical records, and the access was not specifically to provide
20 patient care, that constituted a violation of the confidentiality
21 policies."   (Sherlock Decl. ¶ 7.)   Kaiser's confidentiality
22 policies are in place for "the protection of Kaiser member medical
23 records" and to ensure compliance with "state and federal laws
24 governing [Protected Health Information], especially [HIPAA]."
25 (Sherlock Decl. ¶ 2.)  In fact, Kaiser employees are not "allowed
26 to use HealthConnect to access or copy *even their own records*."
27 (Sherlock Decl. ¶ 15) (emphasis added).   Kaiser's policies in
28

FINDINGS AND RECOMMENDATION    46

1  addition to complying with HIPAA, serve the same privacy interests
2  as the tort Denison sues on here.   Doubtless Denison's interest
3  qualifies as a "privacy" interest.

4      "The   third   and   final   element   of   the   tort   is   that   the
5  intentional   intrusion   upon   a   plaintiff's   private   affairs   or
6  concerns be highly offensive to a reasonable person." *Mauri*, 324
7  Or. at 485.   The oft-cited section 652B of the Restatement Second
8  of Torts notes that the intrusion "may be by some other form of
9  investigation   or   examination   into   his   private   concerns,   as   by
10 opening his private and personal mail, searching his safe or his
11 wallet, examining his private bank account, or compelling him by
12 forged court order to permit inspection of his personal documents."
13 Restatement (Second) of Torts § 652B, cmt. b (1977).   However,
14 "[t]here   is   []   no   liability   unless   the   interference   with   the
15 plaintiff's seclusion is . . . the result of conduct to which the
16 reasonable   man   would   strongly   object." Restatement (Second) of
17 Torts § 652B, cmt. d.

18     HIPAA suggests Congress has determined reasonable people want
19 their medical records private and strongly object to those records
20 being inappropriately accessed.   Indeed, Kaiser's counterclaim
21 suggests it thinks so as well.   Viewing the evidence in the light
22 most favorable to the nonmoving party, a material issue of fact
23 exists as to whether the reasonable man would object to his medical
24 records   being   accessed   without   consent,   regardless   of   the
25 information   obtained.   The   same   could   be   said   about   accessing
26 personal   mail,   bank   accounts,   or   other   personal   documents.
27 Accordingly, Defendants' motion for summary judgment on Plaintiff's
28

FINDINGS AND RECOMMENDATION      47

1  invasion of privacy claim should be denied.

2      Denison's second allegation is based on Fisher distributing
3  her "private contact information that she intentionally kept secret
4  to protect her daughter and grandchild from domestic violence."
5  (Pl.'s Resp. at 39.)   This allegation is fundamentally flawed.
6  Denison claims the dissemination of her "private phone number is
7  highly offensive to a reasonable person in light of the fact that
8  she kept the information secret to protect her daughter and
9  grandchild from domestic violence." (Pl.'s Mem. at 40.)  However,
10 Denison admits she never told Fisher her number was to be kept
11 confidential, she simply assumed that the former staffing person
12 would have supplied Fisher with that information. (Denison Dep.
13 184:23-185:25) (I "didn't feel I needed to tell him personally")
14 Once Denison communicated her concerns to Fisher, he immediately
15 removed her contact information from the list. (Denison Dep.
16 201:11-23.)  In no way does the record support Denison's counsel's
17 argument that Fisher "knew the reasons that Ms. Perez-Denison kept
18 that information private, but disregarded her privacy and the
19 safety of her family to send that information to all of her
20 coworkers." (Pl.'s Resp. at 40.)  Thus, with respect to the second
21 allegation, Defendants' motion for summary judgment should be
22 granted.

23     **B.  Evidentiary Objections**

24     In his reply brief, Fisher raised several evidentiary
25 objections related to the declarations Denison offers in support of
26 her response to Defendants' motions for summary judgment.
27 Specifically, Fisher objects to Paragraph 8 of the Tennant

28

FINDINGS AND RECOMMENDATION    48

1 Declaration; Paragraph 7 of the Leach Declaration; Paragraphs 12
2 and 14 of the Harper Declaration; Paragraphs 6, 10, and 15 of the
3 Lindgren Declaration; Paragraph 8 of Danielle Denison's
4 Declaration; Paragraphs 9 and 11 of the Brooks Declaration; and
5 Paragraphs 18 and 41 of Jeanne Denison's Declaration.

6      Here, the vast majority of Fisher's objections are duplicative
7 of the summary judgment standard itself. *See Burch*, 433 F. Supp.
8 2d at 1119 (stating, "objections to evidence on the ground that it
9 is irrelevant, speculative, and/or argumentative, or that it
10 constitutes an improper legal conclusion are all duplicative of the
11 summary judgment standard itself.") Nevertheless, I did not rely on
12 the cited portions of the aforementioned declarations. Thus,
13 Fisher's evidentiary objections should be denied as moot. *See*
14 *Operating Eng'r Pension Trust Fund v. Clarke's Welding, Inc.*, 688
15 F. Supp. 2d 902, 907 (N.D. Cal. 2010) ("Because the Court does not
16 rely on the statement in this declaration, it is not necessary for
17 the Court to rule on these [evidentiary] objections.")

18                          **Conclusion**

19      For the reasons stated above, Kaiser's motion (Docket No. 47)
20 for summary judgment should be GRANTED in part and DENIED in part,
21 and Fisher's motion (Docket No. 48) for summary judgment should be
22 GRANTED in part and DENIED in part.

23                      **Scheduling Order**

24      The Findings and Recommendation will be referred to a district
25 judge. Objections, if any, are due February 14, 2011. If no
26 objections are filed, then the Findings and Recommendation will go
27 under advisement on that date. If objections are filed, then a
28

FINDINGS AND RECOMMENDATION    49

1  response is due March 2, 2011. When the response is due or filed,

2  whichever date is earlier, the Findings and Recommendation will go

3  under advisement.

4       Dated this 27th day of January, 2012.

5                                    /s/ Dennis J. Hubel

6                                    _____
                                        Dennis James Hubel
7                                    Unites States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FINDINGS AND RECOMMENDATION      50